E. B. & A. C. WHITING CO. ET AL. *v.* CITY OF BURLINGTON.

May Term, 1934.

Present: POWERS, C. J., SLACK, MOULTON, THOMPSON, and SHERBURNE, JJ.

Opinion filed October 2, 1934.

448

450

*Chas. H. Darling* and *H. B. Shaw* for the plaintiffs.

*Theodore E. Hopkins* for the defendant.

THOMPSON, J. At a special meeting of the legal voters of the city of Burlington, hereafter called the city, held on January 3, 1934, the city was authorized, by a majority of the votes cast, to issue bonds to an amount not to exceed $178,000, for the purpose of making certain public improvements.

The plaintiffs, who are large taxpayers in the city, brought this bill of complaint against the city, praying for an injunction restraining it from issuing the bonds voted at the special meeting on the grounds that the meeting was illegally called, and that two-thirds of all the voters voting at such meeting did not vote to authorize such public improvements and the issuance of the bonds to pay for them. A temporary injunction was issued. The defendant demurred to the bill; and, on hearing on the demurrer, the demurrer was sustained, the temporary injunction dissolved, and the bill dismissed. The plaintiffs appealed.

The plaintiffs allege in their bill that 2,453 legal voters voted at the special meeting; that 1,225 voted in favor of the proposal to bond the city, and 1,198 voted against the proposal. It is also alleged that the special meeting was illegally called, and that the vote taken at the meeting was null, void, and without effect for that reason.

The plaintiffs allege further that the charter of the city is silent as to whether the vote of the legal voters at the special meeting held on January 3, 1934, should be by a majority vote or a two-thirds vote; that section 342 of the charter provides that all powers not expressed in the charter shall be governed by the statutes of this State; that the statutes of this State (Public Laws, chapter 150) provide that there shall be a two-thirds vote of all the voters voting at such meeting to authorize the city to issue bonds; that the vote at such meeting was not decided by a two-thirds vote, and was therefore null and void.

Prior to 1917, the statutory provisions, other than charter provisions, regulating the issuance of bonds and other moneyed obligations by municipal corporations, were contained in chapter 157 of the Public Statutes of 1906, Act of No. 84 of the Laws of 1908, and Act No. 126 of the Laws of 1912.

Act No. 105 of the Laws of 1917 was an act entitled: "AN ACT REGULATING THE ISSUANCE OF MUNICIPAL BONDS." It was the first general, comprehensive legislation on the subject, and it provided in detail the procedure for the voting on and the issuance of bonds by municipal corporations to pay for public improvements, and it expressly repealed chapter 157 of the Public Statutes and the acts of 1908 and 1912. That act became chapter 176 of the General Laws of 1917. Several sections of chapter 176 of the General Laws were amended by subsequent acts, and, as so amended, and with

slight editorial changes, which are immaterial, that chapter became chapter 150 (sections 3603-3632) of the Public Laws of 1933. All of our general statutory provisions regulating the issuance of bonds by municipal corporations, in force at 'the time of the special meeting, are found in chapter 150 of the Public Laws, and, for convenience, we refer to the sections of that chapter.

Section 3603 provides: ''The term 'municipal corporation' as used in this chapter shall include a city, town, village (and) town school district, * * *.'' Subdivision I of section 3604 provides: ''The term 'legislative branch' of a municipal corporation as used in this chapter shall mean the mayor and board of aldermen of a city, * * *.'' Section 3605 provides that when the legislative branch of a municipal corporation at a regular or special meeting called for that purpose shall by resolution passed by a two-thirds vote of all its members determine that the public interest or necessity demands. improvements and that the cost of the same will be too great to be paid out of the ordinary annual income and revenue, it may at any subsequent meeting of such legislative branch called for that purpose, by a two-thirds vote of all its members, order the submission of the proposition of making such public improvements, and of incurring a bonded debt to pay for the same, to the qualified voters of such municipal corporation at a meeting to be held for that purpose.

The first part of section 3606 provides how the meeting shall be called. The last paragraph of this section reads as follows: ''*When two-thirds of all the voters voting, at such meeting vote to authorize such public improvements and the issuance of bonds to pay for the same, the legislative branch shall be authorized to make such public improvements and to issue bonds as hereinafter provided.*'' (The italics are ours.) There 'are other provisions of the chapter which relate to the issuance and sale of the bonds and other details when a public improvement has been voted in the method provided by sections 3605 and 3606, which are not material here.

Section 3631 provides: ''This chapter shall not affect rights allowed a municipal corporation by its charter provisions, nor any rights granted by a special act of the legislature.'' The language of section 4103 of chapter 176 of the General Laws is the same as that of P. L. 3631. Section 29 of No. 105 of the

Laws of 1917 read: ''This act shall not affect rights *now* allowed any municipal corporation by its charter provisions, nor any rights *now or hereafter* granted by special act of the legislature.'' (The italics are ours.) In the revision of 1917 the words in italics were omitted as unnecessary.

Act No. 242 of the Laws of 1908 is the charter of the city. The Act has been amended, but it is necessary to call attention to such amendments only as are material here. Section 25 of the charter, as amended by section 17 of Act No. 163 of the Laws of 1927, provides: ''Special meetings of all the legal voters of said city, shall be called by the mayor upon request by resolution of the board of aldermen or on the petition of thirty legal voters for any legal purpose beyond the jurisdiction of the city council, said purpose to be set forth in the warning for said meeting, * * *.'' Section 36 of the charter provides that ''the mayor and board of aldermen in their joint capacity shall be called the city council.''

It appears from an examination of the Session Laws that there were general revisions of the charter of the city by the Legislature at the sessions of 1896 (No. 148), 1906 (No. 261), and 1908 (No. 242); that section 63 of the present charter is the same as section 69 of the revision of 1896 and section 63 of the revision of 1906, except for certain changes which are not material here.

Section 63 reads as follows: ''Whenever the legal voters of said city shall give authority to the city council thereof to pledge the credit of said city for any purpose, said city shall have power and authority to issue its negotiable orders, warrants, notes or bonds, and to prescribe whether such bonds shall be registered or have interest coupons attached, to the amount, not to exceed the limit prescribed by law, for which the legal voters aforesaid shall have given authority to so pledge the credit of the city, such notes or bonds to be payable at such time and at such a rate of interest as shall be established by said voters; or if no time or rate of interest is fixed thereby, the same shall be established by resolution of said city council.''

By Act No. 11 of the Special Session of 1933, hereafter called Act No. 11, the city was authorized to bond, to an amount not to exceed $400,000, ''for the purpose of raising funds with which to pay that portion of the cost and expense of any public improvements which said city must bear, to obtain from the

United States government under any present acts of the Congress of the United States, the aid and benefit afforded to municipalities by such acts in making such improvements, * * *."
Except for stating the purpose for which the credit of the city is to be pledged, and limiting the amount to $400,000, this act, until the last sentence is reached, repeats the language of section 63 of the charter. The last sentence reads as follows: *"The power and authority hereby granted to said city shall be its exclusive power and authority to issue its negotiable orders, warrants, notes or bonds for said purpose, and is in addition to and shall not increase or diminish the power and authority granted to said city by section 63 of No. 242 of the Acts of 1908, as amended, to issue its negotiable orders, warrants, notes or bonds for any purpose other than the one herein named."* (The italics are ours.) This act was approved July 19, 1933, and it took effect from its passage.

The city seems to have some doubt as to whether the bonds in question were voted under the provisions of section 63 of the charter or under the provisions of Act No. 11, as it seeks to uphold the vote of the special meeting under section 63 and Act No. 11 separately, and, also, under section 63 and Act No. 11 together. However, any doubt that may exist is resolved by Act No. 11 itself, as the last sentence of the act expressly provides that the power and authority granted to the city by its provisions shall be the exclusive power and authority of the city to issue bonds for the purpose therein mentioned.

Of course, in passing upon the question before us, we must consider the provisions of the charter of the city and of Act No. 11 in connection with the provisions of chapter 150, as the provisions of the chapter must control, except as to rights allowed the city by its charter provisions or granted to it by special act of the Legislature.

The fact that the city obtained special authority from the Legislature to vote upon and issue bonds to pay for the public improvements mentioned in Act No. 11, seems to indicate that it had some doubt as to its power to vote upon and issue such bonds under the provisions of its charter without resorting to the provisions of chapter 150, which, it is evident, it attempted to avoid; and there is ground for such a doubt.

It appears from the bill that the first method specified in section 25 of the charter, as amended, for calling a special meet-

ing of the legal voters of the city, *i.e.*, by resolution of the board of aldermen, was first invoked and failed of adoption; that thereupon the second method specified in section 25, as amended, was resorted to, and the meeting was called on petition of thirty legal voters. This last method of calling a special meeting of the legal voters can be used only when the purpose of the meeting is beyond the jurisdiction of the city council.

P. L. 3604 makes the city council the ''legislative branch'' of the city, and P. L. 3605 gives the city council, as the legislative branch of the city, jurisdiction to initiate the proceedings necessary for calling a special meeting of the legal voters to authorize the city to issue bonds to pay for a public improvement, under the provisions of chapter 150.

If it were not for Act No. 11, it might be argued with some force that the city council had jurisdiction of the matter in question, and a special meeting of the voters could not be called on the petition of thirty legal voters; that the procedure specified in P. L. 3605 would have to be followed. But, as the plaintiffs do not now question the legality of the call for the special meeting, that question is not before us, and we do not pass upon it.

The revisions of the charter of 1896, 1906, and 1908, and Act No. 11, are silent as to the proportion of the vote cast at a meeting called for that purpose that is necessary to authorize the city to issue bonds.

The city contends that, since the revisions of the charter allowed it to bond for any purpose beyond the jurisdiction of the city council without expressly stating the proportion of the vote required to decide the question, the common-law rule that the question shall be decided by a majority of the votes cast must be invoked to give effect to the rights and powers granted in 1896, 1906, and 1908 by what is now section 63 of the charter; that the common-law rule is necessarily implied in the interpretation of section 63, and is as much a part of it as what is expressed, and is necessarily implied to enable the city to carry the provisions of section 63 into effect; that since, at the time of the enactment of No. 105 of the Laws of 1917, the city possessed the right under section 63 to issue bonds for any purpose when authorized by a majority of the votes cast at any meeting legally called for that purpose, the requirements of P. L. 3606 for a two-thirds vote cannot apply, because, to apply

such requirement, would affect the then existing charter right of the city to bond by a majority vote.

It contends further that, as to the proportion of the vote required to decide the question under the provisions of Act No. 11, that act must be considered as a re-enactment and continuation of the power and authority granted by section 63 of the charter, and to allow, by necessary implication, the issuance of bonds by a majority vote, because the authority given to the city by the act to issue bonds is given in the same language as the authority in section 63 of the charter; that the act is a special act, and, by the provisions of P. L. 3631, the rights granted by it cannot be affected by any of the provisions of chapter 150; that, standing alone, the act, by necessary implication, gives the city the right to issue bonds by a majority vote; that it will be assumed that the Legislature intended that Act No. 11 should provide in itself the necessary rule as to the popular vote required to give it effect; that neither the act nor section 63 of the charter is silent on the question of such rule, as both, by necessary implication, provide that the common-law rule that a majority of the votes cast on the question shall decide the matter, will control; that the common-law rule, therefore, is as much a part of Act No. 11 as if it were within the letter of the act, and is as much a part of the act as what is expressed, so it cannot be said that the act or section 63 of the charter is silent as to the proportion of the vote required.

The foregoing are the principal contentions of the city, and, so far as possible, we have stated them in the language of the brief of the city.

We would, ordinarily, be unable to perceive how section 63. of the charter is material in this case, because the special meeting of the voters of the city could not have been held under its provisions, as the power and authority granted to the city by the provisions of Act No. 11 is the exclusive power and authority of the city to issue bonds for the purpose therein specified. But, as the city contends that, in the absence of a different rule prescribed by its charter or by some general law, the common-law rule that the majority of the votes cast at such meeting should decide the question, is a right allowed the city by its charter provisions, and therefore, by the authority of P. L. 3631, such right cannot be affected by the requirement of P. L. 3606 for a two-thirds vote, we consider that question, as its determi-

nation will probably control as to whether the common-law rule is a right granted to the city by the provisions of Act No. 11.

■ The common-law rule is that, where an act is to be done by an indefinite body, it is valid if passed by a majority of those present at a legal meeting, no matter how small a portion they may constitute of the whole number entitled to be present. 2 Dillon on Municipal Corporations (5th ed.) § 520. Mr. Dillon says in this section that this common-law principle of majority rule has been deemed applicable to the towns of New England; that in those towns the corporate powers reside in the inhabitants, or citizens at large, and these form the constituent body; that, if the meeting has been duly called and warned, those who assemble, though less than a majority of the whole, have the power to act and bind the whole, unless it is otherwise provided by law.

Mr. Blackstone (1 Commentaries, 478) says: "In aggregate corporations, also, the act of the major part is esteemed the act of the whole. By the civil law this major part must have consisted of two-thirds of the whole; else no act could be performed * * *. But with us, any majority is sufficient to determine the act of the whole body."

In 2 Kent's Commentaries, 293, it is said: "The same principle prevails in these incorporated societies as in the community at large, that the acts of the majority in cases within the charter powers, bind the whole. The majority here means the major part of those who are present at a regular corporate meeting. There is a distinction taken between a corporate act to be done by a select and definite body, as by a board of directors, and one to be performed by the constituent members. In the latter case, a majority of these who appear may act; but in the former, a majority of the definite body must be present, and then a majority of the quorum may decide."

In *Field* v. *Field*, 9 Wend. (N. Y.) 394, 403, the court said: "The rule of the common law is, where a society or corporation are composed of an indefinite number of persons, a majority of those who appear at a regular meeting of the same, constitute a body competent to transact business."

P. L. section 1234 declares that "so much of the common law of England as is applicable to the local situation and circumstances and is not repugnant to the constitution or laws shall be

law in this State and courts shall take notice and govern themselves accordingly.''

■ The common law thus adopted is so much of the unwritten law of England, as amended or altered by acts of Parliament, which was in force at the time of the migration of settlers to this country, as is applicable to the local situation and circumstances and is not repugnant to our Constitution or laws and such other acts of Parliament passed since the migration which have been adopted by our courts. 1 Nathaniel Chipman (2d ed.) 62; *Nash* v. *Harrington*, 2 Aikens, 9, 16 A. D. 672; *State* v. *Parker*, 1 D. Chipman, 298, 300, 6 A. D. 735; *Clement* v. *Graham*, 78 Vt. 290, 298-300, 63 Atl. 146, Ann. Cas. 1913E, 1208; *In re Heaton's Estate*, 89 Vt. 550, 569, 96 Atl. 21, L. R. A. 1916D, 201; *State* v. *O'Brien*, 106 Vt. 97, 170 Atl. 98.

■ ■ That the common-law rule that the decision of the majority of the constituent body of a municipal corporation voting at a legal meeting shall be taken as the will of the whole, is not repugnant to the Constitution or laws of this State, and is applicable to the local situation, clearly appears from the fact, of which we take judicial notice, that meetings of the constituent bodies of municipal corporations of this State have always been controlled by the common-law rule of majority vote when there was no charter or statutory provision providing otherwise.

In determining whether the common-law rule of majority vote is a right allowed the city by its charter provisions, it is necessary to consider the position the common law occupies in the jurisprudence of this State.

■ The English common law has been adopted as the basis of American jurisprudence in all the states of the Union except in the state of Louisiana; and it is the general rule in the states where it has been adopted that it prevails except as modified, changed, or repealed by statutes, or in so far as it is not inconsistent with the constitution or the statutes or the institutions of the state, and where, except for the common law, proper remedies for injustice and wrong, and for the redress of grievances, would not be furnished. 5 R. C. L. 808, 814; *State* v. *Parker, supra; Martin* v. *Bigelow*, 2 Aikens, 184, 16 A. D. 696; *Commonwealth* v. *York*, 9 Metc. (Mass.) 93, 110, 43 A. D. 373; *Perry* v. *Strawbridge*, 209 Mo. 621, 632, 108 S. W. 641, 16 L. R. A. (N. S.) 244, 123 A. S. R. 510, 14 Ann. Cas. 92; *Waters*

& Co. v. *Gerard,* 189 N. Y. 302, 82 N. E. 143, 24 L. R. A. (N. S.) 958, 121 A. S. R. 886, 12 Ann. Cas. 397; *Friend* v. *Childs Dining Hall Co.,* 231 Mass. 65, 120 N. E. 407, 5 A. L. R. 1100; *U. S. Fidelity & Guaranty Co.* v. *Bramwell,* 108 Or. 261, 217 Pac. 332, 32 A. L. R. 829; *Allen* v. *State,* 183 Wis. 323, 197 N. W. 808, 39 A. L. R. 782; *O'Hagan* v. *Fraternal Aid Union,* 144 S. C. 84, 141 S. E. 893, 57 A. L. R. 397.

■ The common law adopted in some of the states is declared to be "the law of the land," except so far as changed by statute. *Beavers' Admx.* v. *Putnam's Curator,* 110 Va. 713, 67 S. E. 353. In other states, the statute makes the common law adopted by them "the rule of decision." *State Bank* v. *Gross,* 344 Ill. 512, 176 N. E. 739, 75 A. L. R. 172; *In re Tyler's Estate,* 140 Wash. 679, 250 Pac. 456, 51 A. L. R. 1088; *Gas Products Co.* v. *Rankin,* 63 Mont. 372, 207 Pac. 993, 24 A. L. R. 294; *Swayne* v. *Lone Acre Oil Co.,* 98 Texas, 597, 86 S. W. 740, 69 L. R. A. 986, 8 Ann. Cas. 1117. The common law adopted in this State is the "rule of decision" in all the courts.

In *State* v. *Parker, supra,* page 300 of 1 D. Chip., Chief Justice Chipman said: "The framers of our constitution constantly kept in view, and almost the first act of our State Legislature was to declare 'that so much of the common law of England as is applicable to our local circumstances, and is not repugnant to the constitution, or any particular act of the Legislature of this State, be and is adopted as law within this State, and all Courts are to take notice thereof and govern themselves accordingly.' It is from this source, the common law, that we derive rules and maxims not only for the construction of statutes, but of the constitution itself; and, with the limitation expressed, it is the rule of property and the security of our rights; and furnishes to the Courts, in all cases, civil and criminal, *a rule of decision.* (Italics are ours.) The Courts can no more deprive a person, prosecuted for a crime, of a common-law right, than they can deprive him of a statute or constitutional right; modes of practice merely they may alter, for the more safe and easy attainment of the ends of justice, so that they do not infringe any essential right."

By "a rule of decision," as that term is used in that case, is meant that the common law adopted in this State is the law of this State, and is to be administered as such by our courts. It is the foundation of our jurisprudence, and, except as modi-

460

fied or repealed by statute, its rules and principles determine the rights of, and prescribe rules of conduct for, all persons, and such rules and principles are to be followed and applied by our courts in all cases to which they are applicable.

■ We pay no attention to the contention of the city that section 63 of the charter and Act No. 11 are not silent as to the proportion of the vote necessary to decide the question at a meeting of the legal voters. There is nothing in the language of the charter or of Act No. 11 on that subject, and that certainly is silence.

Since the charter of the city is silent as to the proportion of the vote cast at a legal meeting of the voters which is necessary to authorize the city to issue bonds, and there was no general law regulating that subject, except as to matters which are immaterial here, the common law prevailed and fixed a majority of the votes cast at such a meeting as the proportion necessary to decide the question prior to the enactment of No. 105 of the Laws of 1917. *Heiskell* v. *Mayor,* 65 Md. 149, 4 Atl. 116, 57 A. R. 308; *Murdoch* v. *Strange,* 99 Md. 89, 107, 57 Atl. 628, 629, 3 Ann. Cas. 66.

■ The word "allow" has many meanings, two of them being "to grant"; "to give." As a municipal corporation has only such rights or powers as are granted or given to it in unmistakable terms, or by an implication equally clear, it is apparent that the Legislature, when enacting P. L. 3631, used the word "allowed" in its sense of "granted" or "given," *i.e.,* a right granted or given to a municipal corporation by its charter rather than a right inferred to supply an omission; and that P. L. 3631 should be construed as though it read: "This chapter shall not affect rights granted a municipal corporation by its charter or by a special act of the Legislature."

If it was the right of the city, prior to the enactment of No. 105 of the Laws of 1917, to decide the question at a meeting of its legal voters by a majority vote, it was a right prescribed by the common law, and not a right granted or given to it by its charter or by a special act of the Legislature. It was the rule of the common law which applied to the meetings of every municipal corporation except when a different rule was established by its charter or by some general law.

■ ■ Nor can it be said that the common-law rule is an implied charter right. A municipal corporation is a creature

of the Legislature, and it possesses only such powers or rights as are expressly granted to it by the Legislature, or fairly implied in or incident to those expressly granted because necessary to carry the latter into effect. *Sargent* v. *Clark,* 83 Vt. 523, 77 Atl. 337; *Village of Swanton* v. *Highgate,* 81 Vt. 152, 153, 69 Atl. 667, 16 L. R. A. (N. S.) 867; *New Haven* v. *Weston,* 87 Vt. 7, 13, 86 Atl. 996, 46 L. R. A. (N. S.) 921; *Peru Turnpike Co.* v. *Peru,* 91 Vt. 295, 298, 299, 100 Atl. 679, L. R. A. 1917E, 559; *Mount Pleasant* v. *Beckwith,* 100 U. S. 514, 25 L. ed. 699; *City of Detroit* v. *Detroit City Ry. Co.* (C. C.), 56 Fed. 867; *Gagnon* v. *Butte,* 75 Mont. 279, 243 Pac. 1085, 51 A. L. R. 966; *American Aniline Products* v. *Lock Haven,* 288 Pa. 420, 135 Atl. 726, 50 A. L. R. 121; *Harlan* v. *Employers' Ass'n,* 162 Md. 124, 159 Atl. 267, 81 A. L. R. 342; 19 R. C. L. 768.

The general rule is that the charter of a municipal corporation is to be strictly construed against it; the presumption being that the Legislature granted in clear and unmistakable terms all that it intended to grant. *Sargent* v. *Clark, supra; Peru Turnpike Co.* v. *Peru, supra.* In the last case (page 299 of 91 Vt., 100 Atl. 679, 680) this Court said: ''The rule governing the construction of such grants is thus stated in the cases: 'Every reasonable doubt is to be resolved adversely. Nothing is to be taken as conceded but what is given in unmistakable terms or by an implication equally clear. The affirmative must be shown. Silence is negation, and doubt is fatal to the claim. This doctrine is vital to the public welfare.' *Northwestern Fertilizing Co.* v. *Hyde Park,* 97 U. S. 659, 24 L. ed. 1036. 'Nothing passes but what is granted in clear and explicit terms. * * * Whatever is not unequivocally granted in such acts is taken to have been withheld.' *Holyoke Water Power Co.* v. *Lyman,* 15 Wall. 500, 21 L. ed. 133; *People* v. *Newton,* 112 N. Y. 396, 19 N. E. 831, 3 L. R. A. 174.''

Applying this rule to the instant case, it must be said that no powers or rights expressly granted to the city by its charter have been called to our attention from which the rule of majority vote can be implied because necessary to carry such powers expressly granted into effect. The rule of two-thirds vote, or of unanimous vote, can as reasonably be implied as that of majority vote. If the rule of majority vote is a right by implication, it is a right by implication from the common law because of the silence of the charter and of the statutory law on

that subject, and not by implication from any power expressly granted to the city.

*State* v. *Gitchell,* 90 Vt. 57, 96 Atl. 383, 384, relied upon by the city, does not support its contention that the common-law rule of majority vote is necessarily implied from the powers expressly granted to it by its charter and by Act No. 11.

In that case the respondent was prosecuted for failing to obtain a permit to erect a building in the city of Montpelier as required by an ordinance passed by the city council. The ordiance provided, in substance, that when the matter of granting a permit to build in the city came before the city council, a permit might be granted by the council by a majority vote if the report of the building inspector was favorable, but only by a two-thirds vote .if his report was unfavorable. The charter of the city was silent as to the vote necessary to grant a permit, and there was no general law regulating that subject.

This Court, when holding that the ordinance was void because of the provision in the ordinance for a two-thirds vote, said: ''The charter powers of the city council in respect to buildings are among a long list of powers all .to be exercised in the same way; that is, impliedly by a majority vote of a quorum, for this is the well-established rule, unless a different rule is established by a provision of the charter or by some general law.'' This sentence of the opinion is relied upon by the city as supporting its contention. The ''well-established rule'' referred to in this sentence is the common-law rule that a majority of all the members of a city council must be present to constitute a quorum, and then a majority of the quorum may decide. 2 Kent's Commentaries, 293, *supra*. The authorities cited in the opinion hold that, as the common law fixes the majority of the definite body of a municipal corporation as the legal body, when its charter is silent, and no general law regulates the subject, that body cannot fix a greater number because, to attempt to do so, is to attempt to change a rule of the common law, which it cannot do unless expressly authorized by the Legislature; and that is just what this Court held in the Gitchell Case.

It appears from the Acts of 1917, that ten special acts were passed at that session empowering ten municipal corporations to issue bonds to pay for public improvements when authorized by the legal voters of the corporation. Five of the acts ex-

pressly provided that the authorization of the voters should be by a majority vote, and five were silent on that subject. All of the acts were passed before the enactment of No. 105 of the Laws of 1917, which was approved April 12, 1917, and took effect from its passage. Eight of the special acts took effect from their passage. Two of them, in which the authority to bond was by amendment of their charters, did not take effect until the provisions of the acts had been accepted by the voters of the respective corporations.

It appears from an examination of the Acts of 1915, that at that session of the Legislature several special acts were passed which empowered certain municipal corporations to issue bonds to pay for public improvements when authorized by the legal voters of the corporation. One act provided that the authorization by the legal voters should be by a two-thirds vote of the voters voting, some of the acts expressly provided for a majority vote, and others were silent on that subject.

If it were to be held that where its charter or a special act authorizing it to bond was silent on the subject, a municipal corporation was, by implication, authorized to bond by a majority vote, it would defeat one of the principal objects of Chapter 150, *i.e.*, to make it less easy for a municipal corporation to pay for public improvements by the issuance of bonds, by requiring the assent of two-thirds of the voters voting before incurring such indebtedness. On the other hand, the Legislature did not intend to deprive a municipal corporation of the right to bond by a majority vote, or some other vote, when that right had previously been expressly granted to it by its charter provisions or by a special act of the Legislature, or might thereafter be so granted.

It is a rule of construction that a statute is to be construed with reference to its manifest object, and, if the language is susceptible of two constructions, one of which will carry out and the other will defeat such manifest object, it should receive the former construction. *Martin* v. *Fullam,* 90 Vt. 163, 171, 97 Atl. 442; *In re National Guard,* 71 Vt. 493, 499, 45 Atl. 1051, 1053. And, ''This law is to be construed so as to carry into effect the intention of the Legislature, which is to be ascertained from the language of the act taken as a whole, and from its application to existing circumstances and necessities:'' *In re*

*National Guard, supra; Legg* v. *Britton,* 64 Vt. 652, 658, 24 Atl. 1016.

Applying these rules to the instant case, it clearly appears, in the light of what we have hereinbefore said of the manifest object of the provisions of chapter 150, that it was the intention of the Legislature that the rights of a municipal corporation which are not affected by the chapter, are, under the provisions of P. L. 3631, only such rights as are expressly granted to it by its charter provisions or by a special act of the Legislature, and not implied rights.

While it is not questioned that the common law or particular principles or rules thereof may be repealed or abrogated by the Legislature, the rules of the common law are not to be changed by doubtful implication, nor overturned except by clear and unambiguous language. *Dewey* v. *St. Albans Trust Co.,* 57 Vt. 332, 338; *State* v. *Central Vt. Ry. Co.,* 81 Vt. 459, 462, 71 Atl. 193; *State* v. *Hildreth,* 82 Vt. 382, 384, 74 Atl. 71, 24 L. R. A. (N. S.) 551, 137 A. S. R. 1022, 18 Ann. Cas. 661. But the common law is impliedly repealed by a statute which is inconsistent therewith, or which undertakes to revise and cover the whole subject-matter. *State* v. *Stokes,* 54 Vt. 179; *Boston Ice Co.* v. *Boston & Maine R. R.,* 77 N. H. 6, 86 Atl. 356, 45 L. R. A. (N. S.) 835, Ann. Cas. 1914A, 1090; *Commonwealth* v. *Cooley,* 10 Pick. (Mass.) 37; *Pearce* v. *Atwood,* 13 Mass. 324, 355; *First Nat. Bank* v. *White,* 220 Mo. 717, 738, 120 S. W. 36, 132 A. S. R. 612, 16 Ann. Cas. 889, 895; 12 C. J. 186, sec. 15.

It appears clearly from an examination of chapter 150, that it was the intention of the Legislature, in enacting that chapter, that its provisions should regulate and control the whole subject-matter of the voting on and the issuance of bonds by municipal corporations to pay for public improvements, and, particularly, as to the proportion of the vote cast by the legal voters of a corporation that is necessary to authorize the issuance of such bonds.

The express provision of P. L. 3606 requiring a two-thirds vote of all the voters voting to authorize the public improvements and the issuance of bonds to pay for the same is so inconsistent with the common-law rule of majority vote, that it must be held that P. L. 3606 abrogates the common-law rule, except when the charter provisions or a special act of the Legislature expressly empower a municipal corporation to decide the

question by a majority vote. It is a case where the maxim *expressio unius est exclusio alterius* applies. *Grout* v. *Gates,* 97 Vt. 434, 447, 124 Atl. 76; *Hackett* v. *Amsden,* 56 Vt. 201, 206; *Sherwin* v. *Bugbee,* 16 Vt. 439, 445.

 We cannot agree to the contention of the city that it will be assumed that the Legislature intended that Act No. 11 should provide in itself the necessary rule as to the popular vote required to give it effect. If we could assume that fact, it would not aid the city, as the act is silent on that subject.

It appears from the Acts of the Special Session of 1933, that five special acts were passed at that session empowering five municipal corporations, including the city, to issue bonds to pay for public improvements when authorized by the legal voters of the corporation. Two of the acts expressly provided that the authorization by the legal voters should be by a majority vote; the other three acts were silent on that subject. Act No. 15 of the Special Session empowered the city of Winooski to issue bonds for the same purpose that is specified in Act No. 11. The first section of Act No. 15 is in the exact language of the first section of Act No. 11, except that the first sentence reads: ''Whenever the legal voters of the city of Winooski shall by a majority vote of those voting at a duly called meeting,'' etc.

 Applying the rule that it will be presumed that the Legislature granted to the city in clear and unmistakable terms all that it intended to grant, it cannot be assumed, Act No. 11 being silent on the subject, that the Legislature intended that the authorization of the city by the legal voters to issue bonds for the purpose specified therein should be by a' majority vote. Silence is negation. If the Legislature had intended that the question should be decided by a majority vote, it would have said so, as it did say in Act No. 15.

The city concedes that chapter 150 is intended to apply to all bond issues by municipal corporations of this State, to pay for public improvements, where charter provisions or a special act do not, standing alone, control the matter or grant the requisite authority. We have already held that is the manifest object of the chapter.

 We hold that, since the charter of the city and Act No. 11 are silent on the subject, the requirement of P. L. 3606, that a two-thirds vote of all the votes cast is necessary to decide

██

466

the question, controlled at the special meeting in question; that, as two-thirds of the voters voting at that meeting did not vote to authorize such public improvements and the issuance of bonds to pay for the same, the city was not given, and does not possess, the legal authority to issue bonds to pay for the public improvements specified in Act No. 11.

Other questions which have been briefed by the city have not been given special consideration for the reason that they are disposed of by what we have said.

When this case was heard in this Court, the plaintiffs, by written stipulation of the parties, were permitted to amend the original bill, so that it now appears therein that the special meeting of the voters of the city was called "to authorize said issue of bonds for the purpose of making certain public improvements." The stipulation further provides "that such amendment shall be considered as part of the original complaint and be treated as if made in the court below, and that the same shall have the same effect that it would have had if made a part of the original bill."

The plaintiffs' bill of complaint, as amended, presents a case which gives them the right to the injunction for which they pray; and the demurrer to the bill should have been overruled.

*Decree reversed, and cause remanded.*