STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT<br>Environmental Division Unit | ENVIRONMENTAL DIVISION<br>Docket No. 57-5-19 Vtec |

| | |
|---|---|
| Bundy Staniford Road Non-Applicability<br>Determination Appeal (#19-0547DT) | |

### Decision on Appellant's Summary Judgment Motion

Appellant/Applicant Ericka Redic ("Appellant") filed a request with the City of Burlington Department of Permitting and Inspections ("Permitting Department") for a determination that certain provisions of the City's zoning regulations were not applicable to her triplex apartment building at 251 Staniford Road ("the Property") and that she was therefore not required to apply for and receive a permit or "special exemption" to continue to operate her property as a triplex. When her request was turned down, Appellant submitted a timely appeal to the City of Burlington Development Review Board ("the DRB"). When the DRB affirmed the determination of denial by the Planning Department, Appellant filed a timely appeal with this Court.

Now pending before the Court is Appellant's motion for summary judgment. The City of Burlington ("the City") opposes Appellant's motion and has filed a memorandum in opposition and a Response to Appellant's Statement of Undisputed Material Facts. Each party has also filed exhibits and affidavits in support of their respective representations concerning the material facts.

Appellant is represented in these proceedings by Attorney John L. Franco, Jr., Esq. The City is represented by Kimberlee J. Sturtevant, Esq.

### Legal Standard

To prevail on a motion for summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a), applicable here through V.R.E.C.P. 5(a)(2); *see also* Pettersen v. Monahan Safar Ducham, PLLC, 2021 VT 16, ¶ 9 (*citing* Morrisseau v. Hannaford Bros., 2016 VT

17, ¶ 12, 201 Vt. 313).  When considering a motion for summary judgment, the nonmoving party receives the benefit of all reasonable doubts and inferences.  Pettersen, 2021 VT 16, ¶ 9 (*citing* Robertson v. Mylan Labs., Inc., 2004 VT 15, ¶ 15, 176 Vt. 356).  In determining whether there is any dispute over a material fact, "we accept as true allegations made in opposition to the motion for summary judgment, so long as they are supported by affidavits or other evidentiary material." White v. Quechee Lakes Landowners' Ass'n, Inc., 170 Vt. 25, 28 (1999) (citation omitted); V.R.C.P. 56(c)(1)(A); *see also* Lawson v. Halpern-Reiss, 2019 VT 38, ¶ 21, 210 Vt. 224 (*quoting* Gross v. Turner, 2018 VT ¶ 8, 208 Vt. 112) (noting that once a claim is properly supported in a motion for summary judgment, the nonmoving party must come forward with admissible evidence to raise a dispute regarding the facts).

**Factual Background**

We recite the following background, which we understand to be undisputed unless otherwise noted, based on the record now before us and for the sole purpose of deciding the pending motion.  The following are not specific factual findings with precedent outside of this summary judgment decision.  *See* Blake v. Nationwide Ins. Co., 2006 VT 48, ¶ 21, 180 Vt. 14 (*citing* Fritzeen v. Trudell Consulting Eng'rs, Inc., 170 Vt. 632, 633 (2000) (mem.)).

1.      The Property is now occupied by Appellant; she is the fourth generation of her family to own and occupy the Property.

2.      A single building was constructed on the Property sometime in 1963 and purchased and first occupied by Appellant's maternal grandparents, Arlene and Eugene Tetreault, in January of 1964.  The Tetreaults lived at the Property until their passing (Mr. Tetreault died in 1992 and Mrs. Tetreault died in 2016).

3.      Mrs. And Mr. Tetreault had two daughters, Joy Black and Lynn Bundy.  Ms. Bundy is Appellant's mother.

4.      The Tetreaults consistently occupied an apartment on the first floor of the building on the Property since shortly after their purchase in January of 1964.  After they moved in, Mr. Tetreault's mother, Laura Tetreault, moved into a one-bedroom apartment on the second floor of the building, after having been displaced by the City's urban renewal project of the mid-1960s

that condemned and raised a number of apartment buildings in the Italian neighborhood of the City's Old North End.

5.      After Mr. Tetreault's passing, Ms. Bundy occasionally lived in the first-floor apartment with her mother; Mrs. Tetreault lived there continuously. Then, in 2000, Mrs. Tetreault deeded the property to her two daughters: Ms. Bundy and Ms. Black, while reserving a life estate in the Property for herself. Mrs. Tetreault passed away in March 2016.

6.      Ms. Bundy continued to live in the first-floor apartment after her mother's passing. In the fall of 2018, Appellant Redic moved into the first-floor apartment, which she eventually occupied with her husband.

7.      In 2019, Appellant and her husband sought to purchase her aunt's (Ms. Black's) half interest in the Property.[1] At first, they sought conventional financing for their purchase. However, their bank expressed concern about the legality of the use of the building as a triplex. When the bank's questions were not susceptible to being answered quickly, Mr. and Mrs. Redic arranged for Ms. Black to provide seller financing for their purchase of her half interest.

8.      Appellant's recollection is that her family has consistently used the building on the Property as a triplex, with one or more members of her family occupying the apartment on the first floor and the two apartments on the second floor (a one-bedroom apartment on the westerly side of the building and a two-bedroom apartment on the easterly side) being rented out to others.

9.      Appellant and her husband continue to occupy the first-floor apartment and continue to rent out the two apartments on the second floor to separate tenants.

10.      Appellant's recollection of the Property being continuously used as a triplex is somewhat supported by the documents revealed during this litigation's discovery. Utility records reveal three, and sometimes four electric meters installed and maintained on the Property (the fourth being explained as recording electrical usage for the basement, and the three others for each of the three apartments). Gas metering also suggests the usage of three separate apartments.

---

[1] The current record does not reveal whether the Redics have yet acquired Ms. Bundy's half interest in the Property. At one point. Ms. Redic is referenced as "attorney in fact for Lynn Bundy . . .." *See* <u>Notice of Appeal</u>, filed May 3, 2019. This clarification of how the title to the Property is currently held is not a fact that is material to our resolution of the pending motion.

11.     By affidavit, Ms. Bundy represents that two tenants separately rented and occupied the single bedroom apartment for nearly twenty years: from July 24, 1990 to the end of April 2010.

12.     Ms. Bundy recalls that the only time tenants were not actively occupying the two second floor apartments were during infrequent, short-term periods, when renovations were undertaken or a change in tenant occurred.  The parties reference specific periods when the rental of one or the other second floor apartment were discontinued for 60 to 90 days, one period occurring in 2010 and another in 2017.  Id.

13.     The City counters that Appellant and her family members do not provide any evidence that their building was ever permitted as a triplex.  Appellant does not dispute this absence of permit approval.  Records from the Permit Department and the City Assessors' Office reveal a somewhat conflicting history of the building being used or identified as a single-family home, a duplex, and even a triplex.

14.     In fact, in several instances, Appellant or her relatives who were predecessor title holders represented that the building was a "duplex."  *See*, Application for a City zoning permit, dated January 25, 2017, and filed by Ms. Black on behalf of the then owner, Ms. Tetreault, a copy of which the City submitted as City Exhibit C to its Opposition Memorandum.  This application requested a permit to replace a roof over the basement door entryway.  While the permit that issued does not speak to the general use of the building, the application upon which this permit is based also lists the property uses as "Multi-Family: #2 Units."  Id. at 2.

15.     The City also submitted copies of several excerpts from the City Assessors' records for the Property.  *See* City Exhibit D to its Opposition Memorandum.  We understand that these City Assessor records were based upon representations received from the then property owner and the City officials' observations.  These records contain multiple representations, including the original lister entries that identify the structure as a "Two Family" and a "Duplex" (Id. at 2); and describe the Property as "contain[ing] 11,100 sq. ft. of land" and the building mainly classified as "2 family with a(n) COLONIAL Building Built [sic] about 1964." Id. at 11 (capitalization in original).  However, separate records within the Listers' file also note that there were two rental units on the second floor of the building, and that these rental units at that time generated rental incomes of $600.00 and $375.00 per month, respectively.

16.     At the time of the building's construction in late 1963, the then-existing zoning regulations regarded single family homes as permitted uses and a duplex as an authorized use, once conditional use approval was received; a triplex use at that time in this zoning district was not allowed, unless a "special exemption" was issued.  *See* 1962 City of Burlington Zoning Regulations §§ 6506-6507, and § 6509(5)(a).  There was no evidence presented that a "special exemption" was issued in 1963 or later for the Property.

17.     Appellant's review of her family's records for the Property also did not discover a permit or "special exemption" document for the Property.

## Discussion

This appeal is premised upon a somewhat different set of alleged facts but focuses on a similar legal issue that we recently addressed.  In 15-17 Weston St. NOV Appeal, we reconciled the statutory directives that illegal zoning violations could only be prosecuted within "15 years from the date the alleged violation first occurred and not thereafter . . ." with a provision from the City's zoning regulations that exempts a long-standing illegal zoning activity from this statutory "safe harbor" when the zoning violation is discontinued for more than 60 days.  15-17 Weston St. NOV Appeal, No. 40-3-19 Vtec slip. op. at 5–11 (Vt. Super. Ct. Envtl. Div. Jan. 22, 2021) (Durkin, J.) (*quoting* 24 V.S.A. § 4454(a)) (appeal pending).  We therefore revisit those legal principals and apply them to the undisputed material facts in this appeal.

We first note one legal concept on which the parties here appear to agree: that this appeal is not governed by the legal concepts concerning pre-existing, but now non-conforming zoning uses or structures.  The record before us does not reveal any foundation for asserting that Appellant's current use of her Property was the subject of a permit authorizing that use, or that the triplex use predated the applicable zoning regulations.  Further, there appears to be no dispute that the current triplex use does not conform to the current City zoning regulations.

To determine what facts are material to the legal issues before us, we must first identify those legal issues.  *See* Watson v. Vill. at Northshore I Ass'n, Inc., 2018 VT 8, ¶¶ 18–20, 35–38, 207 Vt. 154 (2018) (identifying legal issues and later addressing material facts before the Court); *see also* V.R.C.P. 56(a) (discussing material facts); V.R.E.C.P. 5(a)(2); Appeal of Rueger, et al., No. 122-7-04 Vtec, slip op. at 2–3 (Vt. Super. Ct. Envtl. Div. July 08, 2005) (Durkin, J.).  In this appeal,

there initially appears to be several material facts that are in dispute, including when the triplex use of the Property first occurred; for how long it has continued; and even whether the short-term non-use of one or both of the second-floor apartments should be regarded as "discontinued," as that term is used in the zoning regulations. However, we do not conclude that these disputes about material facts are an immediate reason for this Court to deny Appellant's pending summary judgment motion. Rather, we focus our analysis by defining the controlling legal issues.

Appellant here repeats several legal propositions from the 15-17 Weston St. appeal. These are substantive legal issues, and we do not intend for our short analysis here to be regarded as dismissive. There is no dispute that when considering the source of a Vermont municipality's authority to enact zoning regulations, which the City does not appear to dispute, that Vermont is not a home rule state, but rather is governed by "Dillon's Rule," which provides that "a municipality has only those powers and functions specifically authorized by the legislature, and such additional functions as may be incident, subordinate or necessary to the exercise thereof." Hinesburg Sand & Gravel Co. v. Town of Hinesburg, 135 Vt. 484, 486 (1977)(*citing* Valcour v. Village of Morrisville, 104 Vt. 119, 131–32 (1932); E.B. & A.C. Whiting Co. v. City of Burlington, 106 Vt. 446, 460–61 (1934) ( "A municipal corporation is a creature of the Legislature, and it possesses only such powers or rights as are expressly granted to it by the Legislature, or fairly implied in or incident to those expressly granted because necessary to carry the latter into effect."); *see also*, 12 E. McQuillin, The Law of Municipal Corporations § 36.02 (3d.ed.1970).

Appellant challenges the authority of the City to enact § 5.3.2 of the City of Burlington Comprehensive Development Ordinance ("the CDO"), which provides that:

> Although not subject to enforcement action pursuant to Article 2, uses, structures, and lots which are deemed to be controlled by the Bianchi decision, and the subsequent enactment of 24 VSA Sec. 4454, shall be considered violations that are not considered legal to any extent and shall in no event be granted the consideration or allowances of nonconforming structures, uses, and lots. Thus, no change, alteration, enlargement, and reestablishment after discontinuance for more than sixty (60) days or reconstruction after an occurrence or event which destroys at least 50% of the structure in the judgment of the city's building inspector shall be permitted, except to a conforming use, structure, or lot.

CDO § 5.3.2: "Bianchi" controlled uses, structures, and lots.[2]

To help understand the Hinesburg Sand & Gravel precedent and determine its applicability to Appellant's assertions here, we look to the established facts of the Hinesburg case. The Hinesburg Sand & Gravel Company was in the business of producing and selling sand and gravel to the general public. Hinesburg Sand & Gravel Co. v. Town of Hinesburg, 135 Vt. at 485. The Town of Hinesburg operated its own sand and gravel pit, which it used to produce the same products for its own use, but also operated its sand and gravel pit in such a manner as to produce extra products, which the Town sold to others, including "corporations, [other] municipalities, and the general public, at established posted prices, whether or not the purchasers are residents of the Town." Id. When measured by product volume or payment received, the Town-produced sand and gravel was used by the Town as little as 10% of the time, with as much as 90% of the product sold and used by others. Id. Nonetheless, the Town asserted that its sale of "surplus" sand and gravel was merely "incidental" to its production for its own use, and therefore a lawful municipal activity. Id. at 485–86.

The trial court agreed with this characterization, but the Supreme Court reversed, concluding that "the principal activity at the Hinesburg [Town] pit is a private business operation . . ., in direct competition with the plaintiff . . ., selling [the sand and gravel] in tax-free competition with the plaintiff, and realizing therefrom a [significant] annual profit." Id. at 486.

Recognizing that Vermont municipalities are not governed by "a home rule constitutional provision," Id. at 485–86, the Supreme Court concluded that the Town's sale of sand and gravel at such a significant rate beyond its own needs "is not a legally authorized activity and is not incidental or subordinate to any legally authorized activity." Id. at 487.

Unlike in Hinesburg, the Town's activities here are subordinate and incidental to its powers and authority to enact zoning bylaws that regulate the allowed uses of land and to restrict the existing uses that do not conform to those regulations.

As we held in 15–17 Weston St., we conclude that, on the facts presented in this appeal, the enactment of CDO § 5.3.2 does not represent a usurpation of the Legislature's exclusive

---

[2] For a summary of the Supreme Court Bianchi decision, the rationale for it, and the actions that flowed from it, including the City's enactment of CDO § 5.3.2, see 15–17 Weston St., No. 40-3-19 Vtec, slip. op. at 5–8 (Vt. Super. Ct. Envtl. Div. Jan 22, 2021) (Durkin, J.).

enabling authority under Dillon's Rule.  Rather, we conclude that "CDO § 5.3.2 [is not] . . . an independent 'statute of limitations' determination," but rather a legitimate municipal land use regulation, already authorized by the existing enabling statutes.[3]  15–17 Weston St., No. 40-3-19 Vtec, slip. op. at 9 (Vt. Super. Ct. Envtl. Div. Jan 22, 2021) (Durkin, J.) (noting that the CDO is "not void under the doctrine of ultra vires, but merely represents a codification of existing law, which prohibits the replacement of a lawful land use with one that is unlawful, whether it previously existed or not").  In essence, the general law, as expressed by our Supreme Court in 204 North Avenue NOV, is that there is a safe harbor established by 24 VSA § 4454(a) for zoning violations that are allowed to continue without prosecution for more than 15 years.  In re 204 N. Ave. NOV, 2019 VT 52, ¶ 7, 210 Vt. 572 (2019) (holding that § 4454(a) applies to all municipal land-use violations).  However, when those violations are discontinued and the land use is returned to one that conforms to the then-existing zoning regulations, the property's use cannot thereafter be returned to a use that defies those regulations, even if such use resembles an illegal use that once existed on the property.  See 15–17 Weston St., No. 40-3-19 Vtec at 10–11 (Jan 22, 2021)

Appellant here, as in 15–17 Weston St., appears to assert that once an illegal use is maintained on a property for more than 15 years, that use can be re-established at any time in the future, even if it has been discontinued and then reestablished to replace a use that now conforms with the current zoning regulations.

Such a broad interpretation of the "safe harbor" established by 24 VSA § 4454(a) would be in direct conflict with at least two important, well established maxims of Vermont land use law.  First, Vermont municipalities are authorized "to identify allowed uses or development and . . . authorized to identify prohibited uses or development . . . .."  15–17 Weston St., No. 40-3-19 Vtec at 10 (Jan 22, 2021); see also 24 V.S.A. § 4411(a) (authorizing "[z]oning bylaws [that] may permit, prohibit, restrict, regulate, and determine land development . . .) and 24 V.S.A.

---

[3]  In 15-12 Weston St., the parties raised a similar argument to that of Appellant here that the CDO discontinuance provision was ultra vires.  In that Decision, this Court notes the history of CDO § 5.3.2 as being adopted after Bianchi and 24 V.S.A. § 4454(a); the Vermont Supreme Court's history of regularly upholding zoning regulations controlling nonconformities in general as a valid exercise of a municipality's police power; the purpose of zoning in eliminating nonconformities; and differences between nonconforming uses and unlawful nonconformities. See 15–17 Weston St., No. 40-3-19 Vtec at 9–11 (Jan 22, 2021).  In 15-12 Weston, this Court particularly noted that in light of these interests, applying 204 North Ave. too broadly would "afford a zoning violator much more [protections] in the way of vested rights than our law now recognizes for lawful nonconformities." Id. at 11.

§ 4411(b)(2) (which authorizes municipalities to enact bylaws that "regulate the expansion, reduction, or elimination of certain nonconforming uses, structures, lots or parcels.").[4]

Second, our Supreme "Court has repeatedly noted that a primary purpose behind the authorization and enactment of zoning regulations 'is to bring about the orderly physical development of a community by confining particular uses to defined areas.'" 15–17 Weston St., No. 40-3-19 Vtec, slip. op. at 10 (Vt. Super. Ct. Envtl. Div. Jan 22, 2021) (*quoting* Vermont Brick & Block, Inc. v. Village of Essex Jct., 135 Vt. 481, 483 (1977)) (*citing* DeWitt v. Brattleboro Zoning Board of Adjustment, 128 Vt. 313, 323 (1970)). "To accomplish this primary purpose, a goal of zoning is to gradually eliminate uses that do not conform with the current zoning regulations "because they are antecedent to the zoning regulations." Id.; *see also* In re McCormick Management Co., 149 Vt. 585, 589 (1988); Hinsdale v. Village of Essex Jct., 153 Vt. 618, 626 (1990).

To adopt the analysis that Appellant espouses here would mean, in our judgment, to disregard these long-established maxims of Vermont land use law. We decline to disregard those maxims, especially since we can interpret the 204 North Ave. precedent, 24 VSA § 4454(a), and CDO § 5.3.2 in a way that gives effect to each.

We conclude that the "safe harbor" established by 24 VSA § 4454(a), as detailed by the Supreme Court in 204 North Ave., exists for any illegal use that continuously evades prosecution for 15 or more years. In re 204 N. Ave., 2019 VT 52, ¶ 7. However, when that illegal use is discontinued, and particularly when it is replaced by a use that conforms to the current zoning regulations, the illegal use cannot then lawfully be rekindled, whether it is mere days, weeks, years, or decades after the illegal use was discontinued.

Burlington's adoption of CDO § 5.3.2, as we noted in 15–17 Weston St.:

> [m]erely represents a codification of existing law, which prohibits the replacement of a lawful land use with one that is unlawful, whether it previously existed or not. In fact, CDO § 5.2.3 affords a zoning violator some greater protection, since the prohibition against reestablishing the zoning violation only is activated when the violation ceases to exist for 60 or more days. Therefore, we conclude that CDO § 5.3.2 serves the lawful interest of diminishing violations and nonconformities by

---

[4] Of import to our analysis here, we understand the phrase "certain nonconforming uses, structures, lots or parcels" is used in this enabling statute to include both lawful pre-existing nonconformities as well as unlawful ones, such as those regarded as outright zoning violations.

withdrawing the protections provided, including the limitations barring enforcement contained in 24 V.S.A. § 4454, against long-standing zoning violations that are discontinued for more than 60 days.

15–17 Weston St., No. 40-3-19 Vtec at 11 (Jan 22, 2021).

With this statement of the legal doctrine that controls our analysis here, we arrive at a better understanding of what facts are material to our analysis. Most importantly, several material facts are disputed, namely whether Appellant or her predecessor in title discontinued the use of the Property as a triplex. Most concerning to us is the January 25, 2017 representation on a zoning permit application by Ms. Black that the Property was a "Multi-Family [with] 2 Units." *See* City Exhibit C.

While the record now before us provides much support for Appellant's representation that she and her family have always used the Property as a triplex, we are compelled to disregard those representations at this pre-trial phase of assessing Appellant's summary judgment motion and viewing all facts in a light most favorable to the City, as the non-moving party. *See* Pettersen v. Monahan Safar Ducham, PLLC, 2021 VT 16, ¶ 9 (*citing* Robertson v. Mylan Labs., Inc., 2004 VT 15, ¶ 15) (noting that the nonmoving party receives the benefit of all reasonable doubts and inferences).

Also concerning to us is whether the facts before us support a characterization that use of the Property as a triplex was discontinued for more than 60 days when one of the rental units was vacated, either for maintenance and renovations, or when there was a changeover in tenants. On the facts currently before us, we are unable to confidently render that determination.

## Conclusion

Since the material facts presently before us are either in dispute or, when read in a light most favorable to the City, do not allow us to conclude that Appellant is presently entitled to judgment as a matter of law, we must **DENY** Appellant's summary judgment motion at this juncture.

We request that the Court Operations Manager set this matter for a final pre-trial conference sometime next month. In the interim, we ask that the parties confer to determine other possible avenues towards resolution. In particular, we note that Appellant's attorney has

advised the Court of his and his client's desire to present the determinations in this appeal to the Vermont Supreme Court in companion with the determinations in the 15–17 Weston St. matter, which is currently on appeal before the Supreme Court. We therefore encourage the parties here to determine if they may stipulate to the question or questions that may be certified to the Vermont Supreme Court, pursuant to V.R.A.P. 5.

Electronically signed on March 26, 2021 at Newfane, Vermont pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Superior Judge
Environmental Division