2008 VT 52

## Mary Raynes v. Earl Rogers

[955 A.2d 1135]

No. 06-342

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed April 18, 2008

*Alexander W. Banks* and *Jo Ann Hertford* (Legal Intern), *South Royalton Legal Clinic*, South Royalton, for Plaintiff-Appellee.

*Allison A. Ericson* and *Joseph A. Campagna* of *Law Offices of Sedon and Ericson*, Chelsea, for Defendant-Appellant.

¶ 1. **Johnson, J.** Defendant appeals from the family court's decision granting plaintiff's request for a final abuse-prevention order. We affirm.

¶ 2. The parties agree on the following facts. Plaintiff and defendant were involved in a romantic relationship and lived together for approximately six years. They separated in February 2006, when plaintiff moved out of defendant's home. Following the separation, the parties continued to have numerous disputes about personal property, including ownership of a horse purchased during the relationship. On June 4, 2006, plaintiff was invited to defendant's home to have dinner and visit the horse. The parties got into an argument. As plaintiff was leaving, she picked up defendant's small dog and took the dog with her to her car. In the confrontation that followed, defendant kicked the door of plaintiff's car and used physical force against plaintiff in an attempt to get his dog back.

¶ 3. Plaintiff sought and obtained an emergency abuse-prevention order; she then requested that the order be made permanent. At the hearing, plaintiff testified that, during the confrontation on June 4, 2006, defendant chased her, grabbed her, kicked the door of her car, grabbed her by the hair, and hit her in the face with a closed fist. She testified that defendant's actions caused her physical pain and fear. Plaintiff further testified that, following this incident, defendant called her repeatedly and drove by her house on numerous occasions, and that she continued to fear him.

¶ 4. When defendant testified, he conceded that he kicked plaintiff's car window on the date in question and that he used physical force against plaintiff, attempting to pry her hands apart to release the dog and, as a result, placing an elbow on her neck. Defendant explained that he took this action in an effort to prevent plaintiff from stealing his dog and that he believed he was justified in doing so. Defendant further conceded that he drove by plaintiff's home four to five times in a single day to keep track of her habits to prove that she was fraudulently obtaining disability benefits.

¶ 5. In closing argument, defendant's attorney argued that defendant was justified in his actions because he used only the amount of force necessary to protect his personal property, namely, his dog. According to defendant, plaintiff was therefore not entitled to relief as provided by the abuse-prevention statute under which the proceedings were held.

¶ 6. The family court rejected defendant's argument, finding that the "[d]efendant had abused the [p]laintiff on that night in question regarding the use of physical force in the car" and had caused her to fear harm, such that the statutory standard for abuse was met. Further, the court found defendant's continuing surveillance of plaintiff after the incident of abuse to be particularly troubling. As a result of defendant's "continuing surveillance, telephone callings, and so on," the court concluded that plaintiff was in reasonable "fear of further harm," and that the emergency abuse-prevention order should therefore be made final. See 15 V.S.A. § 1103(c) (allowing court to issue order to protect the plaintiff if it finds that "the defendant has abused the plaintiff and that there is a danger of further abuse").

¶ 7. On appeal, defendant argues that he was justified in abusing plaintiff, as defined by 15 V.S.A. § 1101, because he used only the amount of force necessary to prevent defendant from stealing his dog. While defendant asserts that the family court erred in failing to make findings as to whether his use of force was reasonable under the circumstances, he argues that in any event it would not be "unreasonable for him to pull [plaintiff's] hair or hit [her] in an effort to force her to drop his dog." Finally, he asserts that the use of reasonable force to defend property should be treated as an affirmative defense barring protective orders under the Abuse Prevention Act and that the court therefore erred in granting plaintiff's final order.

■ ¶ 8. Vermont's Abuse Prevention Act was passed by the Legislature in 1980, in the wake of growing national consciousness of the need for civil legal protections for domestic-violence victims. See L. Goodmark, *Law is the Answer? Do We Know That for Sure?: Questioning the Efficacy of Legal Interventions for Battered Women*, 23 St. Louis U. Pub. L. Rev. 7, 10 (2004); J. Wesley, *Breaking the Vicious Circle: The Lawyer's Role*, 6 Vt. L. Rev. 363, 374 (1981). The statute addresses the pattern of controlling behavior that distinguishes intimate abuse from other forms of

violence by providing a unique legal remedy, injunctive in nature, aimed at ending the cycle of domestic violence before it escalates. See J. Wesley, *supra*, at 374; *Heck v. Reed*, 529 N.W.2d 155, 164 (N.D. 1995) (explaining that domestic violence is "a pattern of assaulting and controlling behavior committed by one household member against another" (quotation omitted)). Abuse-prevention orders are unique in that they are intended to provide immediate relief from intrafamily violence as well as to protect victims from future abuse, rather than to hold perpetrators liable for past acts of violence. As such, to obtain relief under the abuse-prevention statute, a plaintiff need prove only: (1) that a family or household member abused her by "[a]ttempting to cause or causing. [her] physical harm," placing her "in fear of imminent serious physical harm," or stalking her; and (2) that there is a danger of future abuse. 15 V.S.A. §§ 1101(1), 1103(c). Limiting the elements to be proven in this way is in keeping with the statute's remedial purpose: to provide prompt relief to victims of domestic abuse through "inexpensive and uncomplicated proceedings." *Benson v. Muscari*, 172 Vt. 1, 6, 796 A.2d 1291, 1296 (2001) (quotation omitted).

¶ 9. In matters of personal relations, such as abuse prevention, the family court is in a unique position to assess the credibility of witnesses and weigh the strength of evidence at hearing. *Begins v. Begins*, 168 Vt. 298, 301, 721 A.2d 469, 471 (1998). As such, we review the family court's decision to grant or deny a protective order only for an abuse of discretion, upholding its findings if supported by the evidence and its conclusions if supported by the findings. *Wright v. Bradley*, 2006 VT 100, ¶ 9, 180 Vt. 383, 910 A.2d 893.

¶ 10. Abuse-prevention proceedings, by nature, concern disputes among family or household members. See 15 V.S.A. § 1103(a). Thus, at hearing, the parties present evidence of the circumstances of the dispute that led to the alleged incident of abuse that is the threshold requirement for relief under 15 V.S.A. § 1101. In any contested case before the court, the defendant necessarily argues either: (1) that the abuse claimed by plaintiff did not occur, or (2) that defendant was justified in abusing plaintiff. With regard to the latter, courts frequently hear testimony from defendants that the alleged act of violence was provoked by plaintiff's own actions — e.g., name-calling, infidelity, or striking first — and that the plaintiff is therefore undeserving of a protective order. See P.

Roestenberg, *Representing Children When There Are Allegations of Domestic Violence*, 28 Nov. Colo. Law. 77, 78 (stating that "many batterers will minimize their abuse, contend that it occurred in self-defense, or argue that it resulted from the victim's provocation"). While the court considers such testimony in assessing the totality of the circumstances, it does so with its statutory duty in mind — to determine whether the plaintiff is in need of legal protection from intimate abuse, rather than to decide which party was to blame for the dispute that led to the act of violence triggering the abuse-prevention petition.

■ ¶ 11. In the case before us, defendant testified that he kicked plaintiff's car door, grabbed her wrists, and threw an elbow in her neck in the process. He further admitted that he drove by her house four to five times in one day to monitor her whereabouts. Given defendant's admissions and plaintiff's testimony regarding the dog incident, and defendant's later stalking-like behavior, the court did not abuse its discretion in determining that defendant posed a future threat of harm to plaintiff. Contrary to defendant's assertion, the court neither ignored the testimony that plaintiff precipitated the argument by grabbing his dog nor was required to deny plaintiff's request for relief even if it found defendant's version of events credible. The court was required to order appropriate protections for plaintiff if it found both that plaintiff was abused and in danger of future abuse, and it did so here.[1] See 15 V.S.A. 1103(c) ("the court shall make such orders as

---

[1] The dissent entirely misapprehends the nature and purpose of the domestic violence statute. By recognizing a common-law defense of property in this context, the dissent eliminates any protection against an intimate partner's violence that is expressly granted by the statute. The dissent fails to take account of the findings of the trial court, which are against defendant in this case, and the conclusion of the court, based on those findings, that a prima facie case was made out that plaintiff was in need of further protection under the statute. There can be no reversible error under these circumstances.

Contrary to the dissent's assertions, family members acting solely in self-defense or taking reasonable measures to secure their property against a clear invasion need not fear being "branded an abuser" or being "subjected to a relief-from-abuse order" as a result of our decision. *Post*, ¶ 16. If the evidence presented to the trial court establishes that the defendant's actions were entirely defensive in nature, and that the plaintiff has no reason to fear future abuse or harassing behavior, the court cannot statutorily grant relief to the plaintiff. Trial courts are no strangers to situations in which an abuser files for a protective order against a victim who acted in self-defense. In such cases, courts do not grant

it deems necessary to protect the plaintiff" upon finding that defendant abused her and that there is a danger of future abuse).

¶ 12. Nevertheless, defendant argues that the common-law defense-of-property doctrine should be imputed to the abuse-prevention statute, allowing a complete bar to injunctive relief under the statute where the defendant uses reasonable force to protect personal property. Defense of property historically arose in the context of common-law criminal and tort actions. See, e.g., *State v. Patch*, 145 Vt. 344, 349-51, 488 A.2d 755, 759-60 (1985); *State v. Bean*, 107 Vt. 513, 518-19, 180 A. 882, 884 (1935); *State v. Cleaveland*, 82 Vt. 158, 160, 72 A. 321, 321 (1909); *Johnson v. Perry*, 56 Vt. 703, 706-07 (1884); *Hodgeden v. Hubbard*, 18 Vt. 504, 507 (1846). Such actions were concerned with determining the property owner's liability, potentially exposing him to either criminal sentencing or monetary damages. In this context, the common-law defense of property reinforced the importance of citizens' private property rights by exempting property owners from liability for protecting their property against the criminal or tortious invasion of others. See generally E. Volokh, *State Constitutional Rights of Self-Defense and Defense of Property*, 11 Tex. Rev. L. & Pol. 399, 400-09 (2007) (discussing defense of property in context of state constitutional provisions granting right to protect property); L. Alsup, *The Right to Protect Property*, 21 Envtl. L. 209, 217 (1991) (stating that primary common-law right of private property "would have been meaningless without the means to secure [its] enjoyment" by defense of property).

¶ 13. In contrast to criminal or tort actions, abuse-prevention proceedings did not exist at common law, but are based entirely in statute. The statute does not contemplate defense of property as an affirmative defense to relief from abuse because it is based on public policy considerations having nothing do with private property rights and everything to do with protecting

protection to the abuser, because evidence of the nature of the relationship presented at hearing establishes that the abuser does not reasonably fear violence from the victim. Here, the court exercised its discretion appropriately in determining that plaintiff was reasonably in fear of future harm, given defendant's stalking-like behavior, which went above and beyond his physically aggressive response to plaintiff taking the dog to her vehicle. Consequently, plaintiff was entitled to protection under the statute.

victims from intimate abuse.[2] Abuse-prevention actions are reme-
dial in nature, and thereby focus solely on the plaintiff's need for
immediate and prospective protection from the defendant rather
than the defendant's liability for abusing the plaintiff. See *Rapp v.
Dimino*, 162 Vt. 1, 4, 643 A.2d 835, 836-37 (1993) (holding that
abuse-prevention statute "focuses on fast, temporary relief to
family members in immediate danger" rather than resolving
parties' custody, support or property claims). Whereas it makes
sense to allow common-law defenses to crimes and torts that
derive from the common law, the policies underpinning the
abuse-prevention statute, and the protections offered by it, rep-
resent a stark departure from the common-law perspective on
intimate relationships. Compare Note, *Common Law Crimes in
the United States*, 47 Colum. L. Rev. 1332, 1332 (1947) (majority
of states retain English common-law principles to some degree
within their criminal statutes) with R. Siegel, *"The Rule of Love"*:
*Wife Beating as Prerogative and Privacy*, 105 Yale L. J. 2117,
2122-23 (1996) (under Anglo-American common law, husband had
right to use physical force to the extent necessary to command
wife's obedience and chastise her for "misbehavior"). By attempt-
ing to import the common-law defense-of-property doctrine into
the abuse-prevention setting, defendant equates apples with or-
anges. In essence, defendant's argument boils down to a
recharacterization of an assertion commonly made by defendants
in abuse-prevention proceedings: plaintiff brought the violence

---

[2] In fact, the dynamics of domestic violence provide their own salient public policy
argument against allowing an affirmative defense of property in abuse-prevention
proceedings. The hallmark of domestic violence is control of the victim by the
abuser, which commonly includes economic control. See E. Richmond, *The Inter-
face of Poverty and Violence Against Women: How Federal and State Welfare
Reform Can Best Respond*, 35 New Eng. L. Rev. 569, 573 (2001) ("[E]conomic
control is an important component of the batterer's system of maintaining power
over the victim. Abusers prefer their victims to be economically dependent because
such dependence gives the abuser complete power in the relationship." (quotation
omitted)); see also National Coalition Against Domestic Violence, The Problem:
What is Battering, *http://www.ncadv.org/learn/TheProblem_100.html* (last visited
April 10, 2008) (indicating that abusers often exercise control over many aspects of
the victim's life including finances and access to property). Thus, in a situation
where the abuser is rather likely to have physical control, if not legal control, of
the victim's property, it would undoubtedly undermine the purpose of the Abuse
Prevention Act to engage in a contest over whose property is whose and who was
justified in physically defending which property against the other. Again, the
explicit purpose of the statute is to provide a quick and relatively easy mechanism
by which domestic violence victims can access legal protection from abuse.

upon herself and is therefore undeserving of relief from abuse. The critical question in such proceedings, however, is not who was at *fault*, but who, if anyone, is in need of *protection*.

¶ 14. To be clear, we do no violence to the common-law property regime by our decision today; rather, we hold that the common-law defense of property is wholly irrelevant to a determination of whether an alleged victim of domestic violence requires protection from abuse. It is the dissent's interpretation of the Abuse Prevention Act that would undoubtedly reap the more significant change to Vermont law. The dissent would amend the domestic-violence statute so as to incorporate incompatible common-law principles. In so doing, it would turn a simple, straightforward proceeding focused on the plaintiff's need, if any, for legal protection, into a contest over such peripheral issues as who precipitated the violent actions at issue and whether the actor was justified in his actions, thereby eviscerating the statute's protections entirely.

¶ 15. As we have stressed in the past, remedial statutes, such as the Abuse Prevention Act, must be liberally construed to "suppress the evil and advance the remedy intended by the Legislature." *Dep't of Corrections v. Human Rights Comm'n*, 2006 VT 134, ¶ 7, 181 Vt. 225, 917 A.2d 451 (quotations omitted). Construing the abuse-prevention statute in a way that gives credence to the gender-biased myth that domestic-violence victims provoke, and therefore deserve their abuse, would in no way serve its legislative purpose of providing victims with prompt, uncomplicated relief from abuse. See *Heck*, 529 N.W.2d at 164 (discussing legislature's intent to counteract myth that "victims provoke or deserve the violence"); *In re Marriage of Ieronimakis*, 831 P.2d 172, 192 (Wash. Ct. App. 1992) (Kennedy, J., dissenting) (claiming that "[t]he belief that domestic violence is usually precipitated by the victims['] provocations" is pervasive in society and still operates in the judiciary's handling of domestic violence). On the record before us, we discern no abuse of discretion by the family court. There was ample evidence, in fact an admission, that defendant abused plaintiff as defined by the abuse-prevention statute, and further, that plaintiff was in reasonable fear of future harm.

*Affirmed.*

¶ 16. **Burgess, J.,** dissenting. Just to be clear: the majority holds that when an ill-meaning relative, or past or present disgruntled lover, dating partner, roommate or housemate enters your home and, in front of you, grabs your property and runs off with it, or even destroys it, you may not lawfully resist. If you do, says the majority, you are liable to be branded an abuser by the court and subjected to a relief-from-abuse order. This flies in the face of common sense and the centuries old recognition of our right to defend property at common law.[3]

¶ 17. Without any express revocation of that common-law rule by the Legislature, the majority nevertheless reads the Abuse Prevention Act to enjoin anyone who would physically oppose the wrongful taking of her property by a "family or household member," a class so broadly defined as to include all relatives and any and all past and current roommates, co-occupants, dates and sexual partners. 15 V.S.A. § 1101(1), (2). Rather than allowing the use of reasonable force against tortious interference with our personal property as a defense to a claim for relief from abuse, the majority understands the Legislature intended for us to just bleat like sheep. I respectfully dissent from such an absurd application of the statute.

¶ 18. The injustice resulting from this interpretation is particularly manifest when one considers its application to our related rights of self-defense and defense of others. Would the majority subject us to a relief-from-abuse order for defending ourselves and our dear ones from attack? Apparently so. As with defense of property, these rights are also long established at common law,[4] but are not acknowledged in the Abuse Prevention Act. Therefore, according to the majority's reasoning, we must passively, albeit painfully, yield to assault by family or household members lest we

---

[3] See 3 W. Blackstone, Commentaries *121 (memorializing the common-law rule that "in defence of my goods or possession, if a man endeavours to deprive me of them I may justify laying hands upon him to prevent him; and in case he persists with violence, I may proceed to beat him away").

[4] See *Howland v. Day*, 56 Vt. 318, 319 (1883) (upholding as correct a jury instruction that "[w]hen one person is assaulted unlawfully by another, the person assaulted has the right to defend himself, and he has a right to do so to an extent that will make the defence effective."); see also *Mellen v. Thompson*, 32 Vt. 407, 410 (1859) (holding that "every man is legally justified in the reasonable use of force for the prevention of unlawful violence to another's person").

be judicially branded an abuser and issued a restraining order for fighting back.[5]

¶ 19. The majority's concern that we not lend credence to a myth of provocation in domestic violence is entirely misplaced here, since plaintiff's own undisputed testimony presented the facts necessary for the defense.[6] According to her version of events, she took her ex-boyfriend's dog without permission and ran with it into her car, where, despite defendant's demand that she let the dog go, she refused to give up the dog even when defendant pulled her hair. Plaintiff testified further that she still would not relinquish the dog until a blow by defendant stunned her into releasing it, at which point the owner desisted. Thus, plaintiff described herself as committing the tort of conversion, see *Economou v. Carpenter*, 124 Vt. 451, 454, 207 A.2d 241, 243 (1965) (defining conversion as an overt exercise of dominion over another's property "in exclusion and defiance of the owner's right to possession although he does nothing more than detain the property against the rightful owner's demand"), and described defendant as employing the force necessary to regain his dog. See *State v. Downer*, 8 Vt. 424, 428 (1836) (reiterating that resort to

---

[5] Under the Act, a plaintiff must first prove an initial "abuse" as a necessary predicate to an immediate or ongoing "danger of *further* abuse" required for a temporary or final relief from abuse order. 15 V.S.A. §§ 1104(a) and 1103(c) (emphasis added). The majority reads the statute to mean that a "defendant's actions . . . entirely defensive," can constitute the predicate "abuse," *ante*, ¶ 11 n.1, while positing that no defendant is at risk of a restraining order without a threat of "future abuse." *Id.* But when could it be said that one who defends herself and her own against attack once would not do so again and thus, according to the majority, present a "danger of further abuse?" Or, following this logic further, having once defended against attack, a victim may not physically resist again or her successive defense, as perceived by the majority, will present a serial "abuse" and thus a threat of "further abuse" under the statute. Either way, the majority's construction is unlikely to be a reflection of legislative intent.

[6] Claims of provocation are best decided case by case. Common experience in family and district court demonstrates that relatives, roommates, housemates, dates and lovers *are*, in fact, quite capable of unjustified aggression, despite the majority's characterization of that reality as mythical.

In any event, plaintiff's testimony obviates the majority's worry that legitimate abuse claims could be sidetracked by contests over title to property. It was undisputed that defendant owned the dog and plaintiff did not. Notwithstanding the majority's suggestion that an aggressor's domination over another's property might somehow deter or demean a victim's claim of title, *ante*, ¶ 13 n.2, no law favors physical control of property over testimony of contrary ownership. In any event, such competing claims are resolved daily in the trial courts.

force in defense of property is limited to "such force as may be necessary").

¶ 20. Without addressing defendant's claim, the family court summarily entered a finding of abuse based only on the fact that defendant "caused physical harm" to plaintiff. Defendant readily admitted injuring plaintiff, but asserted that his actions were justified by her refusal to give up his dog. Contrary to the majority's understanding, plaintiff's proof of a prima facie case for abuse did not automatically preclude a valid defense, but shifted the burden to defendant to prove defense of property. See *Vermont Structural Steel Corp. v. Brickman*, 126 Vt. 520, 524, 236 A.2d 658, 661 (1967) (after plaintiff establishes a prima facie case, burden shifts to defendants to prove their defense). Plaintiff's own testimony was sufficient for that purpose. It was error to reject the defense out of hand, and the matter should be remanded for a factual and legal determination on defendant's claim.[7]

¶ 21. It has long been "unquestionabl[e]" that a person in possession of property may then and there fend off "a purely wrongful taking or conversion," and that "if one takes another's property from his possession, without right and against his will, the owner . . . may protect his possession, or retake the property, by the use of necessary force." *Stanley v. Payne*, 78 Vt. 235, 240-41, 62 A. 495, 497 (1905); see also *Barrows v. Fassett*, 36 Vt. 625, 628-30 (1864) (holding that property just taken from one's lawful possession may be immediately regained "with a reasonable degree of force," that being "no greater force than was justifiable and necessary for the protection of his possession and in self-defence").[8] These principles have been the law of Vermont since its days as an independent republic. See 1 V.S.A. § 271, first enacted as R. 1787, p. 30 (providing that: "[s]o much of the common law of England as is applicable to the local situation and circumstances and is not repugnant to the constitution or laws

---

[7] Absent any culpability on the part of defendant for his exercise of force to recover his dog, it is unclear that plaintiff could satisfy her burden to prove that defendant unlawfully "abused" her in the first instance. Without such an initial instance of abuse, there may be no predicate "abuse" in evidence to make defendant's alleged stalking afterwards a *further* abuse" as required for a final relief-from-abuse order under 15 V.S.A. § 1103(c) (emphasis added).

[8] Cf. *Bowman v. Brown*, 55 Vt. 184, 185 (1882) (stating the equally ancient rule that when one's property is discovered already in the possession of another, the owner may not break the peace and "'fight himself' into legal possession," but must resort to legal process to regain possession).

shall be laws in this state and courts shall take notice thereof and govern themselves accordingly").

¶ 22. Defense of property is instinctive. That we know from the time we are toddlers that we need not tolerate an unrighteous taking of our things by another is reflected in the Vermont Constitution's recognition that "possessing and protecting property" are among our "natural, inherent, and unalienable rights." Vt. Const., Ch. I, Art. 1. While the Legislature retains the prerogative to alter or abrogate the common law, "the rules of the common law are not to be changed by doubtful implication, nor overturned except by clear and unambiguous language." *E.B. & A.C. Whiting Co. v. City of Burlington*, 106 Vt. 446, 464, 175 A. 35, 44 (1934).

¶ 23. The majority posits that a claim of defense of property is not available in response to an action for a relief-from-abuse order under the Abuse Prevention Act, but that is not what the statute says. An action for relief from abuse may be entirely statutory, but the statute professes no such "clear and unambiguous" revocation of the common-law rule. *Id.* Nor is the principle of defense of property in the slightest way incompatible or inconsistent with the legislative goal of preventing abuse of one relative or household member by another. See *State v. Hazelton*, 2006 VT 121, ¶ 29, 181 Vt. 118, 915 A.2d 224 ("The common law is changed by statute only if the statute overturns the common law in clear and unambiguous language, or if the statute is clearly inconsistent with the common law . . . .") (citation omitted).

¶ 24. As the majority points out, this remedial legislation should be liberally construed to accomplish its purpose of providing protection to victims of abuse, but defense of property and self-defense cannot fall under any rational definition of "abuse." Nor, as imagined by the majority, is the judicial resolution of often-heard allegations of blame an impediment to the relief afforded by the statute. Contrary to the majority's characterization, defense of property confuses no apples with oranges in the context of relief-from-abuse proceedings. If one is injured while unlawfully meddling or attempting to abscond with another's property, he has no "need of legal protection," as cast by the majority. *Ante,* ¶ 10. On the other hand, if one claims, but fails to prove, defense of property to justify physical aggression, a restraining order is warranted. These are not overly burdensome or complicated inquiries, but are typical of disputes handled by the trial court.

¶ 25. This Court ordinarily avoids construing a statute in an absurd manner. See *State v. Longley*, 2007 VT 101, ¶ 10, 182 Vt. 452, 939 A.2d 1028 (noting that a "presumption obtains against a [statutory] construction that would lead to absurd results") (citation omitted). On this occasion, however, the majority would read the Act to reduce us to waiting for the police or to summoning lawyers while a jilted lover, dissatisfied date or malicious housemate drives away with our car, smashes our television, vandalizes our home or harms our pets. It is ridiculous to imagine that the Legislature intended to subject persons to an injunction for defending against the wrongful taking or damage of their possessions by family or household members. Even though the statutory term "abuse," defined as "[a]ttempting to cause or causing physical harm" or threatening "imminent serious physical harm," 15 V.S.A. § 1101(1)(A), (B), does not expressly allow for protection of property, it is equally absurd to conclude that the Legislature meant to treat defense of property as an abuse to be curtailed. Concluding otherwise, absent any express repeal of the common-law rule in this regard, would also countenance repeal by doubtful implication, an approach not favored by our law. *City of Burlington*, 106 Vt. at 464, 175 A. at 44.

¶ 26. The majority's reading of the statute renders our property and our persons literally defenseless against predation by relatives, past and present cohabitants, domestic partners and sexual intimates. Moreover, the majority's understanding must also suppose a legislative intent to single out and sacrifice the sanctity of property and persons of family and households. While leaving other citizens free to defend themselves, their property and their loved ones without sanction, the majority's construction denies these rights as between family and household members. This distinction, required under the majority's analysis, is patently irrational and unfair. Such a "construction as this one, leading to a most unjust and unreasonable result, cannot be interpolated by this Court." *Swanton Village v. Town of Highgate*, 131 Vt. 318, 324, 305 A.2d 586, 590 (1973). I dissent from doing so and am authorized to state that Justice Skoglund joins in this dissent.