VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.      25-AP-219



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

JANUARY TERM,   2026

Angela Ferrante\* v. Steven Adkins

}   APPEALED FROM:
}   Superior Court, Chittenden Unit,
}   Family Division
}   CASE NO. 24-FA-01104

Trial Judge: Brian K. Valentine

In the above-entitled cause, the Clerk will enter:

Plaintiff appeals from the trial court's denial of her request for a relief-from-abuse (RFA) order.  We reverse and remand for additional proceedings.

Plaintiff sought a RFA order against defendant in April 2024.  She alleged that in late 2022, she had a short romantic relationship with defendant after meeting him on the Appalachian Trail.  Plaintiff became concerned by defendant's increasingly violent behavior and ended the relationship.  Plaintiff alleged that defendant later began stalking her and she was afraid of him.

The court held a hearing over three days in May 2024, August 2024, and late February 2025.  At the hearing, plaintiff testified to her brief relationship with defendant and described her concerns about defendant's escalating behavior that caused her to fear for her physical safety.  She stated that defendant threatened to injure himself and other hikers they were traveling with, and that he threw a gas canister at her, among other things.  At the time she ended her relationship with defendant in 2022, plaintiff described running away from defendant and reaching out to law enforcement because defendant followed her to a shelter and told her she shouldn't feel safe.  Plaintiff testified that not long thereafter, defendant posted information about her on a site used by those hiking the Appalachian Trail, disparaging her and alleging she was a danger to herself and others. The post included plaintiff's full name and stated in part: "I recently dickmatized a deranged, slow, thicc, SOBO in her late thirties going by the Trail name 'Detour.'  She is currently suicidal and has had a knife taken from her.  She was threatening to 'kill people in their sleep' at the shelter.  She has also admitted to being off one of her medications."

Several years later, in March 2024, plaintiff shared her concerns about defendant on a private Facebook group called "Women of the PCT [(Pacific Crest Trail)]."  Plaintiff then

received several calls from unknown numbers and a direct message from defendant. In the message, defendant included several emojis, including smiley faces with hearts. He wrote: "[What] can I say? I like to fuck crazy women." He said he was glad plaintiff found some women to commiserate with and support was important after being "traumatized by a big scary man." He told plaintiff that he hoped she "remain[ed] forever innocent," that she "kn[e]w what [she] did," he "would never have to explain himself again," and she should "keep acting." Plaintiff was very disturbed and afraid after receiving the message as it appeared that defendant was monitoring her online activities.

Defendant then began a barrage of social media posts about plaintiff, including posting pictures of her, her former employer and coworkers, and her contact information. He posted a video that he claimed to show plaintiff drinking his urine. He "tagged" her and her former employer in some of these posts and asked, among other things, "How's [plaintiff's] mental health been?" Plaintiff was very concerned by this behavior, including by defendant's apparent efforts to encourage others to engage with her. Plaintiff reached out to police in California, where she believed defendant could be found. Defendant then texted her that the police officer who contacted him thought plaintiff was "fucking crazy," and told plaintiff to "apologize or else, the law," "[b]ut in a different way."

In late April 2024, defendant also posted that he had called plaintiff's employer and learned that plaintiff no longer worked there; he included a gold trophy emoji at the end of the post. On the same day, defendant called plaintiff and left several voicemails, both of which were admitted into evidence. In the first message, defendant apparently believed he was calling plaintiff's employer. He identified himself by name and provided his telephone number and said:

> It's come to my attention that one of your employees, [plaintiff], was using the technology there at [her job] to defame me on Facebook while she was doing her other duties for social media for [employer]. And she was just kind of switching in and out between defaming me and then going back to office duties. And I'm just going to report to you guys now that the PTCA was an organization that reposted these reports from [plaintiff] and they have since redacted the comments and are issuing a public apology for ruining my reputation. The damage is already done but I just wanted to warn you guys about the employee you have there and the consequences that are going to come for her actions through this defamation and libel suit that is going to be brought against her. If you could call me back and confirm if she is in fact still employed with you guys, I would really appreciate it because I do need to have an opportunity to serve her with papers and I would like to do that at her job.

Plaintiff was very frightened to receive this message in light of the other messages defendant had been posting, particularly as defendant was trying to confirm where she worked. She was concerned that he was monitoring her and trying to pinpoint her location.

Fifteen minutes later, defendant called back and left another message on plaintiff's phone. He said:

> Nice fucking try, [plaintiff], nice fucking try . . . how dare you lie about me like that on the internet and think that you were going to get away with it…you really thought that I was some fucking farm boy some country boy that you could just mock imitate and make look like a fool . . . I'm glad I got to show you just what this farm boy was capable of . . . good luck.

Plaintiff was frightened by the message and by defendant's tone. She construed the message to contain an implicit threat of violence and considered defendant's behavior to be escalating toward violence in the same way that led to the parties' breakup in 2022. Plaintiff testified that defendant made hundreds of posts and continued to post about her after she obtained a temporary RFA order. She stated that defendant's behavior interfered with her daily routine, caused her to miss work, lose weight, and not be able to sleep.

Defendant also testified. He provided his version of the day the parties broke up in 2022, asserting that plaintiff engaged in self-harm and threatened harm to others. Defendant stated that in 2024, he learned from others that information about him was being posted on the internet alleging that he had sexually assaulted women. He believed plaintiff was the source of the information. According to defendant, plaintiff told him that she wanted to protect others on the trail and that defendant would not get away with trying to embarrass her. Defendant testified that in response, he warned people on the internet about plaintiff. He said that he found a phone number for plaintiff's employer and called to warn her employer about plaintiff. He filed a lawsuit against a website that had posted allegations about him and demanded a retraction and apology from them. Defendant said he wasn't trying to threaten plaintiff by leaving her voicemails. He testified that he left plaintiff a voicemail to let her know he would be suing her and tried calling her employer to verify that she worked there so he could serve her with his complaint. He denied threatening anyone with violence on the Appalachian Trail, stating that his threat to "curb stomp" another hiker was taken out of context. Defendant testified that some of the "tags" of plaintiff in his posts contained an incorrect address and would not have reached her. He acknowledged posting a screenshot of plaintiff's workplace information including her picture and contact information, although on cross-examination he testified that he did not remember posting the screenshot of plaintiff's information from her workplace or the post in which he tagged plaintiff and her employer and asked "How has [plaintiff's] mental health been?" Defendant stated that he was "traumatized" by plaintiff's behavior when they broke up and his posts about plaintiff were an effort to clear his name.

Three months after the final hearing, the court denied plaintiff's request for an RFA. It made the following findings. The parties met in the fall of 2022. They had a brief sexual relationship. The relationship ended in October 2022 after defendant allegedly threw a camping gas canister in plaintiff's direction, causing her to flee the trail and reach out to law enforcement. Defendant alleged that the relationship ended after plaintiff threatened self-harm. Following their breakup, the parties had no contact with each other until March 2024 when plaintiff alleged that defendant engaged in stalking behavior. Specifically, plaintiff alleged that defendant contacted her and left her a voicemail message about allegations that she had raised about him on a Pacific Crest Trail chat group. Defendant also allegedly attempted to reach out to plaintiff's

former employer by leaving a voicemail message at a number that turned out to be plaintiff's number. He sought to confirm plaintiff's address with her employer so that he could serve plaintiff with a defamation action he threatened to bring against her. Defendant successfully had the chat group retract the posts from plaintiff and apologize to him. The court credited defendant's testimony that he blocked plaintiff on his cellphone and did not wish to speak to plaintiff again.

Based on these findings, the court concluded that, "[t]aken in isolation," plaintiff's "allegations arguably [met] the definition of stalking, in that there were two or more acts in which [defendant] monitored [plaintiff] by leaving her voicemail messages, and . . . those messages were found by [plaintiff] to be threatening." The court was unpersuaded, however, that these incidents caused plaintiff to fear for her safety or suffer substantial emotional distress. The court found that plaintiff's fears were grounded on her allegations of what occurred along the Appalachian Trail when the parties separated in October 2022 and plaintiff failed to establish that the events about how the parties came to separate unfolded as she claimed. The court viewed plaintiff's allegations "in the greater context of what was occurring in the spring of 2024." It found that, at that time and without having had any contact with defendant since October 2022, "[p]laintiff unilaterally engaged in an on-line campaign of character assassination against [defendant] on the Pacific Crest Trail group chat." The court considered it "entirely predictable" that defendant would find out about this, call her out, and try to defend himself by investigating the possibility of bringing a defamation suit against her. "But for [plaintiff]'s actions," the court concluded, "neither of the voicemails left by [defendant] would have occurred." "And but for [plaintiff]'s possible continuing attacks on [defendant's] character," the court did not find a danger of further abuse as required by statute. The court therefore dismissed plaintiff's complaint.

Plaintiff argues that the court engaged in impermissible victim-blaming. According to plaintiff, the court's findings were antithetical to the remedial purpose of the Abuse Prevention Act, they were unnecessary in determining if plaintiff met her burden of proof, and if allowed, they would create a chilling effect on prospective litigants seeking injunctive relief from intimate partner abuse in the future. Plaintiff further asserts that the court's finding that she did not suffer substantial emotional distress was not supported by the evidence and its conclusion that there was no danger of further abuse was unsupported by its findings.

On appeal "we review the family court's decision to grant or deny a protective order only for an abuse of discretion, upholding its findings if supported by the evidence and its conclusions if supported by the findings." Raynes v. Rogers, 2008 VT 52, ¶ 9, 183 Vt. 513. We agree with plaintiff that the court abused its discretion here. Its conclusions are inconsistent with our case law and the statutory scheme and they are unsupported by the court's findings.

The Abuse Prevention Act is a remedial statute that "must be liberally construed to suppress the evil and advance the remedy intended by the Legislature." Rogers, 2008 VT 52, ¶ 15 (quotation omitted). "The Act addresses the pattern of controlling behavior that distinguishes intimate abuse from other forms of violence by providing a unique legal remedy, injunctive in nature, aimed at ending the cycle of domestic violence before it escalates." Id. ¶ 8. RFA orders "are intended to provide immediate relief" and "protect victims from future abuse." Id. We note the significant delays that occurred here, both in hearing this case and issuing a decision.

4

To be entitled to relief, plaintiff needed to show by a preponderance of the evidence that defendant abused her and that there was a danger of further abuse. 15 V.S.A. § 1103(c)(1). Plaintiff alleged here that the abuse consisted of stalking. Id. § 1101(1)(A)(iv). "Stalk" is defined as:

> to engage purposefully in a course of conduct directed at a specific person that the person engaging in the conduct knows or should know would cause a reasonable person to:
>
> (A) fear for the person's safety or the safety of a family member; or
>
> (B) suffer substantial emotional distress as evidenced by:
>
> (i) a fear of unlawful sexual conduct, unlawful restraint, bodily injury, or death; or
>
> (ii) significant modifications in the person's actions or routines, including moving from an established residence, changes to established daily routes to and from work that cause a serious disruption in the person's life, changes to the person's employment or work schedule, or the loss of a job or time from work.

12 V.S.A. § 5131(6). A "course of conduct" means, in relevant part, "two or more acts over a period of time, however short, in which a person follows, monitors, surveils, threatens, or makes threats about another person, or interferes with another person's property." Id. § 5131(1)(A)(i).

We have previously considered a defendant's argument that he was "justified" in abusing a victim. As we explained in Rogers, a defendant in a contested RFA case:

> necessarily argues either: (1) that the abuse claimed by plaintiff did not occur, or (2) that defendant was justified in abusing plaintiff. With regard to the latter, courts frequently hear testimony from defendants that the alleged act of violence was provoked by plaintiff's own actions—e.g., name-calling, infidelity, or striking first—and that the plaintiff is therefore undeserving of a protective order. See P. Roestenberg, Representing Children When There Are Allegations of Domestic Violence, 28 Nov. Colo. Law. 77, 78 (stating that "many batterers will minimize their abuse, contend that it occurred in self-defense, or argue that it resulted from the victim's provocation"). While the court considers such testimony in assessing the totality of the circumstances, it does so with its statutory duty in mind—to determine whether the plaintiff is in need of legal protection from intimate abuse, rather than to decide which party was to blame for the dispute that led to the act of violence triggering the abuse-prevention petition.

5

Rogers, 2008 VT 52, ¶ 10 (emphasis added). "The critical question," we emphasized, "is not who was at fault, but who, if anyone, is in need of protection." Id. ¶ 13.

The court here acted inconsistently with Rogers and the purpose of the Abuse Prevention Act. The court blamed plaintiff for "causing" defendant to "arguably" stalk her. It characterized what plaintiff described as an effort to promote the safety of other women through a post on a private chat group as engaging "in an online campaign of character assassination against [defendant]." It discounted plaintiff's testimony that she was frightened by defendant's actions by making findings about what allegedly occurred when the parties broke up in 2022 without considering whether a reasonable person would fear for her safety based on defendant's actions in 2024. This included posting apparently hundreds of posts about plaintiff, including sharing her photo and personal contact information, contacting her employer and then celebrating the fact that she no longer worked for her employer, attempting to contact her employer to demean and "warn" the employer about plaintiff, and contacting plaintiff directly and indirectly numerous times. Plaintiff testified that she was afraid because defendant appeared to be monitoring her and encouraging others to engage with her by posting her personal information. In considering plaintiff's allegations "in the greater context of what was occurring in the spring of 2024," the court failed to address any of these postings and the effect they had on plaintiff. It clearly erred in describing one of the voicemails that defendant left on plaintiff's phone as simply seeking to confirm plaintiff's address for a lawsuit. The audio shows defendant maligning plaintiff to a person he apparently thought was her employer, indicating that plaintiff was using work time to "defam[e]" him and "warn[ing]" the employer about "the employee you have there and the consequences that are going to come for her actions." The court considered defendant's acts of alleged abuse "predictable" in response to plaintiff's actions, which suggests, as plaintiff argues, that the court decided that she "deserved what she got." The court stated that plaintiff would be to blame for any future abuse if she continued to attack "[d]efendant's character."

As we made clear in Rogers, "[c]onstruing the abuse-prevention statute in a way that gives credence to the gender-biased myth that domestic-violence victims provoke, and therefore deserve their abuse, would in no way serve its legislative purpose of providing victims with prompt, uncomplicated relief from abuse." 2008 VT 52, ¶ 15. As set forth above, it was not the court's role to try to assess who was to "blame" for defendant's actions or to assess whether it was appropriate for plaintiff to attempt to warn others about defendant via a private chat group. But see Johnson v. Freborg, 995 N.W.2d 374, 385 (Minn. 2023) (recognizing "that as a general proposition, speech relating to sexual assault is a matter of public concern (quotation omitted)) (citing additional case so holding); Coleman v. Grand, 523 F. Supp. 3d 244, 259 (E.D.N.Y. 2021) (finding that open letter defendant circulated accusing plaintiff of abuse and sexual harassment involved matter of public concern). The court's role was to determine if plaintiff needed protection from defendant, and the court failed to engage in an appropriate analysis here.

Because the court engaged in improper assessment of who was to "blame" for defendant's decisions to "stalk" plaintiff, its decision cannot stand. We therefore reverse the court's decision and remand for additional proceedings consistent with our case law and the Abuse Prevention Act.

Reversed and remanded for additional proceedings.

BY THE COURT:

Paul L. Reiber, Chief Justice

Harold E. Eaton, Jr., Associate Justice

Nancy J. Waples, Associate Justice

7